## THE STATE v. THE UNION BANK OF LOUISIANA.

Under the second section of the act of 5th of February, 1842, ch. 22, reviving the charters of the Banks in the city of New Orleans, the Board of Currency are entitled to free access to the vaults and books of the Banks ; may call upon their officers at any time ; may take such memoranda and lists as they think proper and necessary ; and may require any officer of such Banks to submit their books and papers to their inspection and examination. But they have no right to call upon those institutions, to make out, at their own expense, statements not expressly required of them by law, though demanded by the Board for the purpose of obtaining information, which it is required by law to lay before the Legislature. The law only exacts that the members of the Board shall be allowed to examine, for themselves, the books and papers of the Banks.

The second section of the act of 24th of February, 1842, ch. 59, supplementary to

---

the act for preventing the further violation of law by the Banks, which imposes a penalty on any president, officer, agent, or clerk of any Bank who shall fail to give a full and complete statement relative to its affairs when required by competent authority, was passed with reference to former laws, and only points out the punishment to be inflicted on those violating their provisions.

APPEAL from the District Court of the First District, *Buchanan*, J.

SIMON, J. The President of the Board of Currency complains that, in the discharge of its official duties, the said Board, on or about the 29th of October, 1842, made an application to the President, Directors, and Cashier of the Union Bank of Louisiana, for certain information, the purport of which is literally recited in the petition ; that in order to facilitate the furnishing of the information and statement, the Board of Currency prepared and sent to the Bank, the forms in which said statements were to be made ; that the information required is material and important to the Board of Currency ; and that the defendants have illegally and peremptorily refused to furnish said information, contrary to the acts of the Legislature passed in 1842, which have been accepted by the defendants, and have thus become a part of the charter of their institution. A writ of mandamus is prayed for, to be directed to the President, Directors, and Cashier, and to the Union Bank of Louisiana in its corporate capacity, commanding them to furnish the information and statements required, or to show cause to the contrary, &c.

The Bank first excepted to the form of this application, on the ground that Germain Musson, as President of the Board of Currency, cannot maintain any action, or appear in court. It further averred, that there is no law requiring them to give the information and statements demanded ; that the demand of such information is unnecessary, vexatious, and arbitrary ; that if it had been disposed to give the same, the time allowed is not sufficient, and that it would cost the institution extra clerk's salary to the amount of one thousand dollars at least, to make the statements demanded, an expense which it is not bound to support.

The defendants' exceptions were overruled, and a peremptory mandamus was ordered to be issued. The defendants have appealed.

The information and statements alluded to, and recited in the petition, 'were demanded of the defendants, by a letter, dated the 29th of October, 1842, as follows :—

1st. A statement, (in the form annexed,) showing the amount due the Bank on the 23d of December, 1841, and the amount remaining due by the same persons on the 26th of March past, and the 26th of November next. The form is now sent you, in order to allow sufficient time to prepare and fill up the first, second, and third columns of the statements, the fourth having to be filled only after the close of business, on Saturday, the 26th of November next.

2d. A' list of the sums due on the 26th of November next, by other persons than those named in the above mentioned statement.

3d. A list of loans in the country.

4th. A list of loans to stockholders, and the proportion of loans to the number of shares held by them respectively.

5th. A detailed list of the real estate held by the Bank, and the cost thereof.

The evidence shows, that the application was made in order to obtain the information which the law requires the Board of Currency should obtain from the Banks, to prepare a statement for the Legislature ; and that the defendants declined furnishing it as required. The answer of the Cashier, in the name of the institution, says : " however, the books of the Bank will be always 'open for your inspection."

Several witnesses have been examined, to show the probable amount of the expense which the information and statements required would cost, and the time which they would take. Two of them estimate it at $500 ; another says that $300 or $400 would be a reasonable compensation for the work ; and another says it would be worth from $800 to $1000. They differ also as to the time, according to the number of clerks employed. They all agree that it would take considerable time to make out the statements called for ; and one of them states that to do the work with perfect accuracy, would take, he supposes, two months.

R. D. Shepherd, who was the first President of the Board of Currency, testifies that in the exercise of his duties as such, he

never experienced any opposition on the part of the defendants ; that, on the contrary, every facility was afforded him, and that all information required by him of the Union Bank was cheerfully furnished. He further states, that it would be highly improper to publish the names of all the debtors of the Bank to the public ; but he should not consider it improper or impolitic to furnish it to the Board of Currency. The stockholders should know the true state of the Bank ; and the witness proceeds to give his opinion on the effect, which the publishing of the names of the debtors of a bank would have upon its credit, &c.

It has been also admitted on all hands, in the argument of this cause, that the Board of Currency has always had free access to the vaults and books of the Union Bank ; that this never was refused ; and that the affairs of the Bank, as shown by the books and papers, have always been open to their examination and inspection.

The powers and duties which are exercised by the Board of Currency in this State, are exclusively derived from an act of the Legislature, approved on the 5th of February, 1842, ch. 22, entitled, " An act to revive the charters of the several Banks located in the city of New Orleans, and for other purposes," and from the several acts amending the same subsequently passed. Such powers, which are very extensive, are pointed out and described in the second section of that act, and our inquiry, therefore, must be limited to ascertaining whether the requisition made in this suit by the Board of Currency, comes within the extent of the powers given by the law under which the Board was established.

Every body knows the origin of the Board of Currency, and those who are in any manner acquainted with the state of the affairs of the country at that time, are aware of the reasons which induced the Legislature to adopt the law which brought it into existence. Its object was to put the several Banks of the State under the supervision and control of three Commissioners appointed by the State, whose principal duty, under the name of the " Board of Currency," should be to regulate their circulation, and " to take care," as the law says, " that the paper money issued under the authority of the State be not depreciated." Have they succeeded, is a question which, perhaps, might be answered by

thousands, but which is not now under our judicial consideration. The powers vested in the Board, were to be used and exercised as a check upon the Banks; and the members of the Board of Currency, receiving their salaries from those institutions, became so far identified with their administration, as to be able at any moment not only to supervise their affairs, but to see *with their own eyes* how they were conducted.

The question then, which presents itself in this case, does not seem to relate particularly to the extent of the powers of the Board of Currency, but to the manner in which those powers are to be exercised. It is rather a question of action, tending to regulate the intercourse between the Board and the Banks, and to ascertain and establish the means which are to be resorted to, to obtain the object of the law.

Under the second section of the law above alluded to, (Laws of 1842, p. 38,) the Board of Currency is vested with the following powers :—

1st. *To supervise* the faithful execution of the act, and of the charters and bye-laws of all Banks working under it.

2d. *Thoroughly to examine the affairs of any Bank, whenever they may deem it expedient to do so*, and at least quarterly.

3d. To require of the President and Cashier of each Bank, on Saturday of each week, *the following statement* in a printed form, signed by them : 1. Capital realized, $——. 2. Amount of "dead weight," under the respective heads of real estate, loans on stock, long loans, personal or otherwise, protested paper, and, in fine, of all assets not realizable within ninety days. 3. Movement of the Bank, to wit : loans on paper payable at maturity, and intended to meet the two-thirds of the cash liabilities unrepresented by specie ; circulation ; deposits, and other cash liabilities ; specie and cash assets.

4th. Said statements shall be regularly filed in the office of the Board of Currency, and the statements so furnished on the last Saturday of each month, shall be signed by the President of the Board of Currency, and published in the State paper on the first Monday in each month.

5th. To call a meeting of the stockholders of any one of the

Banks, whenever expedient, to lay before them full reports of its operations during the year, and of its real situation, &c.

We have looked in vain in the law of the 5th of February, 1842, and in those which were subsequently passed to amend it, for any provision authorizing the Board of Currency to call upon the Banks for any statements similar to those required in the present suit. It is clear that this power is not contained in the second section, and that the statement therein mentioned, which is to be furnished by the Banks weekly and published monthly, is not intended to include and exhibit the various matters and detailed information which form the subject of the present controversy. Indeed, it would be requiring more than the law provides, that is to say, it would be subjecting the Banks to a more burthensome and expensive task than is contemplated by law; for the execution of which they would incur considerable and unnecessary expenses. As the law stands, it seems that the information here required, would be properly the result of the *thorough examination* of the affairs of the Banks, to be made by the Board of Currency, and of the investigation which said Board is empowered to go into, whenever they may deem it expedient. For this purpose, they have free access to the vaults and books of the Banks; they may call upon their officers at any time; they may take such memorandums and lists as they may think proper and necessary; and the President, Directors, Cashier, or other officers of any Bank cannot refuse to submit their books, papers, or documents to the inspection and *thorough examination* of the Board of Currency. This, we understand, to be the extent of the duties which are imposed by law upon the Banks, in their intercourse with the Board of Currency, and is, in our opinion, the safest course which can be adopted to ascertain the exact situation of their affairs. It has been shown, that the defendants have never refused to submit the affairs of their institution to the inspection of the Board. Nay, it has been admitted, that their books and papers have always been open to such examination. No complaint has been made of the Union Bank ever having failed to furnish its weekly statement, as required by law; and we cannot concur with the Judge, *a quo*, in the opinion, that the information here required, should be obtained by means of the statement demanded, at the

exclusive expense of the defendants.   It may easily be derived from an examination of the books of the Bank, which the members of the Board are at liberty to inspect with their own eyes; and is all the law requires.

We have been referred to the second section of an act of the Legislature, entitled, " An act supplementary to an act, entitled, ' an act to prevent further violation of law by the Banks,'" approved on the 24th of February, 1842, which imposes a penalty upon any director, president, officer, agent, or clerk of any Bank, *who shall fail to give a full and complete statement, when required by competent authority.*   This law was passed in reference to former laws, and means nothing more than to point out the punishment which should be inflicted upon those guilty of violating the former provisions.   Still, the question would recur, what statement does this law allude to ?   In the case of the statement which is to be furnished by the Banks to the Board of Currency, which is a competent authority within the meaning of the act, it cannot be doubted that reference should be had to the second section of the law of the 4th of February, in order to ascertain the nature of the statement to be given, *when required;* and surely, it cannot be contested, that this penal law cannot apply to the failure of furnishing any other statement but the one required by the section above recited.   It is clear, as we have already said, that the Banks are not bound to furnish any other statement, and that their officers could only be punished in case of their failing to give such a statement, *as is required by law.*

It is therefore ordered, that the judgment of the District Court be reversed, and the rule obtained below discharged, with costs.

*Preston,* Attorney General, for the State.

*H. R. Denis,* for the appellants.